## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**JEFFREY HAYNES**

**CIVIL ACTION**

**VERSUS**

**NO. 14-743-JWD-RLB**

**GEORGIA PACIFIC, LLC**

### CONSOLIDATED WITH

**GERALD JACKSON**

**CIVIL ACTION**

**VERSUS**

**NUMBER 14-750-JWD-RLB**

**GEORGIA-PACIFIC, LLC F/K/A
GEORGIA-PACIFIC CORPORATION**

### RULING AND ORDER

This matter comes before the Court on the Motions for Summary Judgment (Docs. 28 and 29) filed by Georgia Pacific, LLC ("Defendant"). Plaintiffs Jeffrey Haynes ("Plaintiff Haynes") and Gerald Jackson ("Plaintiff Jackson") (collectively, "Plaintiffs") filed oppositions to these motions (Docs. 35 and 36). Defendant has filed reply briefs (Docs. 37 and 38), and Plaintiffs have filed surreply briefs (Docs. 43 and 44). Oral argument is not necessary. Having carefully considered the law, facts in the record, and arguments of the parties, Defendant's motions are granted.

### I.    Factual Background

#### A.  Introduction

Plaintiffs bring claims of discrimination and retaliation on the basis of race under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); discrimination on

1

the basis of race under the Louisiana Employment Discrimination Law, La. R.S. 23:301 *et seq.* ("LEDL"), and retaliation under the Louisiana Whistleblower Statute, La. R.S. 23:964 *et seq.* ("LWS").

### B.  Defendant's Operations and Project Diamond

Defendant is a large manufacturer and marketer of tissue, packaging, paper, pulp, and building products.[1] (Doc. 28-1 at 1.) It maintains offices and manufacturing facilities throughout the United States, including a facility in Zachary, Louisiana, where both Plaintiffs are employed. *Id.* The Zachary facility is referred to as the Port Hudson mill. Hourly employees at the Port Hudson mill are represented by a Union. *Id.*

In the second quarter of 2010, Defendant announced its plans to spend in excess of $500 million to create two "world class tissue machines" using its new patented tissue-making technology. *Id.* Defendant refers to this undertaking as "Project Diamond." According to Defendant, Project Diamond presented a significant departure from the previous practices and procedures utilized at the Port Hudson mill and it "involved the use of technology and processes that most hourly employees had never previously encountered." *Id.* (citing Doc. 28-3 at 1.) Defendant represents the selection process for employees to fill positions in Project Diamond also presented a departure from the previous method for selecting employees for positions, which was previously based on seniority. (Doc. 28-1 at 2.) Rather, the new selection process was based on an "adaptive work system in which there is no line of progression and all jobs are filled based on qualifications and skills, not strict seniority." *Id.* This new system required employees to work

---

[1] As noted above, Defendant filed two separate motions for summary judgment in this case, one which concerns the claims of Plaintiff Haynes (Doc. 28) and one which concerns the claims of Plaintiff Jackson (Doc. 29). The factual bases for these motions are nearly identical. For purposes of this Ruling, the relevant facts that apply to both motions are cited to the motion concerning Plaintiff Haynes (Doc. 28). However these facts are also found in the motion for summary judgment for Plaintiff Jackson (Doc. 29).

across all aspects of the machine, whereas in the past, employees were required to only work in one discrete area. *Id.*

The Union, management for Defendant, and Plaintiffs were all in favor of the Port Hudson mill being selected for the location for Project Diamond. (Docs. 28-1 at 2; 28-3 at 1; 35-3 at 28; 35-4 at 42.) However, because the Union's labor contract required promotions to be based upon seniority, it conflicted with the new adaptive work system. (Doc. 28-1 at 2.) Defendant's selection of the Port Hudson mill was contingent upon the condition that staffing Project Diamond would be done according to the adaptive system, and not per the Union's seniority system. Although the Union members initially rejected Defendant's proposed Memorandum of Agreement ("MOA") because of seniority concerns, the Union voted in favor of it at the subsequent mill-wide vote. (Doc. 23 at 3.) The Union and Defendant entered into the MOA, which provided that mill seniority would only govern a job selection for a position in Project Diamond if the applicants' qualifications were otherwise "considered relatively equal." (Docs. 28-1 at 2; 28-3 at 1; 28-5 at 1.) After Defendant and the Union signed the MOA, Port Hudson was selected as the site for Project Diamond. (Docs. 28-1 at 2; 28-3 at 2.)

Selection for positions in Project Diamond was based largely upon an employee assessment test, an interview, and supervisory review, among other factors. (Docs. 28-1 at 3-4; Doc. 28-3 at 2.) The team of interviewers consisted of approximately ten members of the Union and ten managers for Defendant. (Docs. 28-1 at 4; 28-4 at 3.) Generally, one representative from Defendant's management and one representative from the Union interviewed each applicant and evaluated them on factors such as "entrepreneurship and thinking skills; knowledge and skills; adaptability and collaboration; initiative; and humility, integrity and professionalism." (Doc. 28-1 at 4.) Based on their findings, each interview team would assign the applicant a score of high,

medium, or low on the aforementioned qualifications, and at the end of each day, the interviewers would meet to discuss the applicants. *Id.* Although Plaintiff Haynes claims Defendant considered any disciplinary action within a five-year period in its evaluation of the applicants (Docs. 35-1 at 10; 35-3 at 56), Defendant represents it only considered disciplinary action within one year preceding the interviews. (Docs. 28-1 at 11; 28-3 at 6.)

Project Diamond created approximately 84 hourly jobs, including four Shift Coach jobs, twenty Master Technician ("Master Tech") jobs, and 60 Technician ("Tech") jobs. (Docs. 28-1 at 2; 28-3 at 2.) The initial hourly rate for a Shift Coach job was $33, the hourly rate for the Master Tech position was either $29 or $34, depending on the assigned work area, and the initial hourly rate for a Tech was $25 or $29, also depending on the assigned work area. (Doc. 28-1 at 3.)

168 employees were eligible to bid for positions within Project Diamond. *Id.* Of the 168 employees, 110 were white, 56 were black, and two were Hispanic. *Id.* Approximately 120 applicants possessed the minimum qualifications for at least one of the 84 jobs in Project Diamond. (Docs. 28-1 at 5; 28-4 at 3.) Of these applicants, approximately twenty-three were eliminated from consideration based on the results of their initial interviews. *Id.* The remaining applicants underwent a supervisory review, which "involved a series of meetings with members of management in which they discussed their opinions of the employees being considered based on their experiences working with and supervising them." (Docs. 28-1 at 5-6; 28-4 at 3-4.) Over twenty members of management as well as several representatives from the Human Resources department participated in the supervisory review meetings. (Docs. 28-1 at 6; 28-4 at 4.) Approximately 39 of the applicants who passed the interview portion of the selection process were not offered a position within Project Diamond in the initial round of job offerings, the majority of whom were white employees. (Docs. 28-1 at 9; 28-3 at 5; 35-3 at 44.)

4

After the interview process was complete, the Union and Defendant separately developed lists with their respective proposed job assignments. *Id.* Pursuant to the MOA, in the event two candidates were relatively equally qualified for a position, Defendant awarded the job to the individual with the most seniority. *Id.* According to Defendant, the decisions for job assignments were made collectively by all of the managers who participated in the application process, and no one individual's opinion was determinative. *Id.* After the interview process was complete, the Union presented Defendant with two separate lists of job assignments, one based solely on seniority without regard for qualifications or experience, while the other considered other factors, including the applicant's qualifications. (Docs. 28-1 at 6-7; 28-4 at 4.) Defendant attempted to amend the Union's list in hopes the entities could reach an agreement on job placements; however the Union was unwilling to deviate from its selections. (Docs. 28-1 at 7; 28-3 at 4.) Despite its failure to reach an agreement on job placements with the Union, Defendant moved forward with its selections in December 2011. *Id.*

Several of Defendant's employees, both black and white, were dissatisfied with the results of the job placements within Project Diamond. (Docs. 28-1 at 10; 28-3 at 6; 35-3 at 44, 45.) The Union, on behalf of its members, filed numerous grievances relating to the job placements within Project Diamond which "complained of a litany of things in connection with the selections, including the failure to award the higher-paying jobs to the more senior employees." (Docs. 28-1 at 10; 28-3 at 6.) In October 2012, Defendant and the Union participated in a federal arbitration concerning issues of seniority and discrimination. (Doc. 23 at 6; No. 14-cv-750, Doc. 1 at 6.) Defendant met with the Union in an effort to amicably resolve these issues, which, in February 2013, led to a settlement concerning job placements within Project Diamond. (Docs. 28-1 at 10; 28-3 at 6; 35-3 at 46.) The settlement resulted in favorable

5

job placements for several employees, including Plaintiffs (who are black), as well as many white employees. (Docs. 28-1 at 10; 28-3 at 6; 35-3 at 46.)

### C.  Plaintiffs' Work History for Defendant

### i.  Plaintiff Haynes's Work History for Defendant

Plaintiff Haynes began working for Defendants' mill located in Port Hudson, Louisiana in August 1988. (Docs. 1-1 at 1; 28-1 at 7.) He has worked for Defendant for 27 years, and is still actively employed by Defendant. (Docs. 23 at 2; 28-1 at 7) He holds a business degree from the University of Phoenix. (Doc. 23 at 5.)

At the time Defendant made its selections for job placement within Project Diamond, Plaintiff Haynes worked as an A Operator in the Tissue Converting Department. (Docs. 28-1 at 7; 36-3 at 21-22.) Accordingly, he was eligible to bid for a position in Project Diamond. *Id.* Plaintiff Haynes states that in 2011, around the time Defendant was selecting individuals for placement within Project Diamond, he was the "most senior member of tissue converting, [and] had been a set-up shift leader for the better part of three years[.]" (Doc. 23 at 4.) He alleges that in his 27 years of service, he has only received two disciplinary marks on his record, one of which he characterizes as a frivolous "witch hunt," and the other for a minor safety infraction. (Docs. 35-3 at 26-27, 28-7 at 77.)

Plaintiff Haynes submitted the necessary paperwork to apply for a job in Project Diamond. (Doc. 28-1 at 7.) He listed the Shift Coach job as his top preference and Master Tech as his second choice; he did not list a third choice.[2] (Docs. 28-1 at 7; 35-3 at 29.) He received "High" scores in two of the four categories upon which he was evaluated, one "Medium", and one "Low" score. (Doc. 35-8 at 39.) Defendant found that while Plaintiff Haynes possessed the

---

[2] Although he did not list a third choice, he indicated on his application that he would like to be considered for other positions even if not selected for his desired positions. (Doc. 35-3 at 29.)

minimum qualifications for the Shift Coach job, he was not "relatively equal in qualifications" to the other applicants, and therefore offered him a Tech position within Project Diamond. (Doc. 28-1 at 7, 9.) Plaintiff Haynes declined the Tech job, calling it an "insult" to be offered the lowest paying job in Project Diamond. (Docs. 28-1 at 9; 35-3 at 17.) In 2013, as a result of Defendant and the Union reaching a settlement regarding job placement within Project Diamond, Plaintiff Haynes was offered a Shift Coach job, which he commenced in April 2013. (Docs. 28-1 at 10; 35-3 at 21, 46.) He continues to work as a Shift Coach, and has incurred no disciplinary action since assuming this position. (Doc. 35-3 at 46.)

### ii. Plaintiff Jackson's Work History for Defendant

Plaintiff Jackson has been employed by Defendant in its Port Hudson, Louisiana mill since December 1988. (14-750, Doc. 1 at 1.) He joined the Union shortly after he began working for Defendant. (Doc. 36-4 at 24.) From 1988 until 2000, he worked in the fine paper converting department. *Id.* He worked for Defendant as a rewinder operator for over ten years. (14-750, Doc. 1 at 5.) From 2000 until 2012, he worked in the Tissue Converting Department. *Id.* In 2012, Plaintiff Jackson transferred to Project Diamond. *Id.*

He alleges that around the time Defendant was hiring for positions within Project Diamond, he was the number four employee in the tissue converting department and, at that time, had over twenty-three years of service at the Port Hudson mill. (14-750, Doc. 1 at 5.) In his twenty-seven years of employment with Defendant, he has never been demoted. (Doc. 36-4 at 12.) Although he was unable to recall specifics, Plaintiff Jackson represents that the only disciplinary action he has incurred while working for Defendant occurred early in his career for absenteeism, for which he received written reprimands. *Id.* However, Defendant attaches as an exhibit to its motion for summary judgment a written reprimand Jackson received on July 3,

2009 for leaving his equipment unattended while conversing with other employees in his department. (Docs. 28-1 at 11; 28-5 at 3.) He has not been subject to any disciplinary action since working for Project Diamond. (Doc. 36-4 at 13.)

When he applied for a position within Project Diamond, Plaintiff Jackson listed Shift Coach as his first job preference. (Doc. 35-4 at 27.) He later stated he put this as his first choice because it paid better than the other available positions, but he did not actually desire the position, nor did he believe he was best qualified it. *Id.* During his deposition, Plaintiff Jackson stated he truly wanted the Master Tech job, which he listed as his second preference, because he felt his skills were best suited for that position. *Id.* He listed wet end Tech as his third preference. (Doc. 29-1 at 8.) Defendant initially offered him a Tech position, which he declined. He currently works for Defendant in its Project Diamond as a Master Tech. (Doc. 35-4 at 12.) However, Plaintiff Jackson alleges that his title of Master Tech is disingenuous; although he holds the title and receives the pay of a Master Tech, he claims that Defendant has refused to properly train him for the position and he is actually doing the work of a Tech.[3] *Id.*

Plaintiff Jackson graduated valedictorian from Sunshine High School in 1970. *Id.* at 20. He has three years of electrical engineering education from Southern University, and he holds a degree in computer technology from WKG Video Electronics College. (14-750, Doc. 1 at 5.)

Plaintiff Jackson has a history of alcoholism, and has four convictions for driving while intoxicated ("DWI"). (Doc. 35-4 at 21.) His fourth DWI, a felony offense, occurred in 2007, while he was employed by Defendant. *Id.* He received a ten-year suspended sentence, five years'

---

[3] However, when asked to explain the difference in the job duties between a Tech and Master Tech, Plaintiff Jackson admitted "[t]here aren't many differences[,]" save that the Master Tech is supposed to serve as a "troubleshooter[.]" (Doc. 36-4 at 12.)

probation, and had to serve 75 days in the parish prison on weekends and days he was not

working. *Id.* He has no other criminal convictions. *Id.*

### D.  Other Employees of Defendant

Plaintiffs allege several other black employees have been treated less favorably than the

white employees working for Defendant. (Doc. 23 at 5-6; 14-750, Doc. 1 at 4-5.) For example,

they cite black employee Kenny Myles, the number two employee in the Tissue Converting

Department by seniority, who had twenty-three years of experience at the Port Hudson mill, and

who applied for a Tech job and Master Tech job, and who "[r]eluctantly [accepted] a master tech

job at the Alveys despite being a rewinder operator for the past 11 years." (Doc. 23 at 5.) They

also point to Greg Johnson, a black employee and number three in seniority in the

Tissue Converting Department, who also has twenty-three years of service at the Port Hudson

mill. *Id.* According to Plaintiffs, Johnson applied for the Master Tech job and Tech job, but was

offered a Shift Coach job "that he did not feel comfortable taking[,]" and was then offered the

Tech job, which paid $25 per hour, despite Johnson holding various certificates that should have

entitled him to the Master Tech position. *Id.* at 5, 7. They also cite Jessie Ward, the number five

employee in Tissue Converting by seniority, who also had twenty-three years of experience at

the Port Hudson Mill. *Id.* at 5. Ward applied for the Master Tech job and the Tech job, and was

offered a Tech job in Project Diamond. Additionally, they argue Joseph Butler, the number seven

employee in Tissue Converting by seniority, should have been offered a position in Project

Diamond based on his experience as a temporary set-up shift leader, but he was not offered a

position during the initial round of job offerings. *Id.* Plaintiffs also list Thomas Ellis, the number

thirteen employee in Tissue Converting by seniority, who applied for a Tech job and Master

Tech job, but was offered neither of these positions in Project Diamond despite his sixteen years of service at the Port Hudson mill. *Id.* at 6.

Additionally, Plaintiffs argue the following white employees were treated more favorably than the aforementioned black employees. The following individuals were offered Shift Coach jobs, which pay $33 per hour: (1) David Morris, who has twenty-three years seniority; (2) Terry Hotard, who has twelve years seniority; (3) Jon Stalder, who has nine years seniority; and (4) Brenda Allen, who has three and a half years seniority. *Id.* at 6-7. They also allege the following employees were offered Master Tech jobs, which pay $29 per hour: (1) John Hodges, who has twenty-nine years seniority; (2) James Marriot, who has twenty years seniority; (3) Shawn Bayham, who has fifteen years seniority; (4) Matt Lewis, who has ten years seniority; (5) Pedro Garcia, who has ten years seniority; (6) Justin Kirkland, who has ten years seniority; (7) Mike Kappus, who has five years seniority; (8) Emerson Bennet, who has eleven years seniority; (9) Mike Boudreaux, who has five years seniority; and (10) Joan Pabon, who has three years seniority. *Id.* at 7.

Defendant claims that Morris, Hotard, Stalder and Johnson were offered Shift Coach jobs because it believed "they were best qualified for the job based on all of the factors considered in the selection process." (Doc. 28-1 at 8.) While Morris, Hotard, and Stalder accepted the position, Johnson declined. *Id.* After Johnson declined, Defendant offered the position to Kenny Myles, who it believed was the next best qualified employee for the position; Myles also declined. *Id.* at 9. After Myles refused the position, Defendant offered the Shift Coach position to Brenda Allen, who accepted. *Id.* Defendant notes that while Allen, Morris, Hotard, and Stadler are white, Myles and Johnson are black. *Id.*

### E.  Plaintiffs' Allegations of Discrimination

Plaintiffs' instant claims of racial discrimination arise out of Defendant's initial failure to award them their desired positions in Defendant's new, multi-million dollar project, Project Diamond. (Doc. 23 at 4-5; 14-750, Doc. 1 at 4.) As "background" information, Plaintiffs allege several instances of discriminatory conduct by several of Defendants' employees, including Port Hudson mill manager, Keith Wahoske, who, according to Plaintiffs, also contributed to the discriminatory hiring practices in Project Diamond. (Doc. 23 at 2; 14-750, Doc. 1 at 1-2.) Plantiffs allege that in 2006, white employee Blake Jenson drove a fork truck with a hangman's noose dragging behind it in front of black employees. (Doc. 23 at 2; 14-750, Doc. 1 at 2.) They also allege that in July 2009, Defendant fired black employee James McKnight for minor infractions, while declining to discipline white employee Kyle Haygood, who committed a "far worse" violation. (Doc. 23 at 2, 14- 750, Doc. 1 at 2.)

With regard to the racial discrimination that occurred during the hiring of employees for Project Diamond, Plaintiffs claim that in November 2011, Plaintiff Jackson had an altercation with Joey Varin, a white employee and the leader of the Project Diamond hiring team. (Doc. 23 at 4; 14-750, Doc. 1 at 3.) This confrontation, which concerned "obvious discrimination" in the hiring process for Project Diamond, resulted in Plaintiff Jackson filing a written grievance. (Doc. 23 at 4; 14-750, Doc. 1 at 3.) Plaintiffs allege the discriminatory hiring practices continued through December 2011. (Doc. 23 at 4; 14-750, Doc. 1 at 3.) In January 2012, representatives for Defendant held an initial hearing on Jackson's November 2011 grievance, and Varin and James Myles, another white employee named in the grievance, denied the allegations contained therein. (Doc. 23 at 5; 14-750, Doc. 1 a 3-4.) In February 2012, the discrimination package which derived from Plaintiff Jackson's written grievance was sent to Defendant's upper management in its Atlanta, Georgia office. (Doc. 23 at 4; 14-750, Doc. 1 at 3-4.) Around the same time, Plaintiff

Jackson filed formal charges with the EEOC. (14-750, Doc. 1 at 3.) In April 2012, Plaintiff

Jackson met with officials from Defendant's Atlanta office to discuss the discrimination

package. (Doc. 23 at 6; 14-750, Doc. 1 at 5.)

> In their complaints, Plaintiffs allege:

> Since the interview and selection process, Project Diamond has become a
> nightmare for senior minority employees. Qualified black employees passed the
> tests and the interview, but when it came to job selection, these employees were
> unceremoniously bypassed for upper tier, high-paying jobs by Varin and Myles.
> These jobs were given to white employees with less credentials and less seniority.
> On November 18, 2011, [Plaintiff Haynes], the most senior member of tissue
> converting, had been a set-up shift leader for the better part of three years but,
> when he applied for the shift coach job in Project Diamond, he was not deemed
> worthy of consideration and was only offered the lowest paying job in Project
> Diamond. To date, none of the senior minority employees have been given an
> explanation as to why they were bypassed for the top tier jobs in Project
> Diamond. Minority employees have tried using the local grievance process, but
> were stone walled by Wahoske. These senior minority employees have shown
> exemplary leadership, dedication, and commitment to safety and production as
> evidenced by their safety and production records.

(Docs. 23 at 4-5; 14-750, Doc. 1 at 4.)

Plaintiff Haynes's racial discrimination claim arises out of Defendant's failure to award

him a position as a Shift Coach or Master Tech during its initial round of job offerings. He

alleges his experience, skills, and seniority surpassed those individuals who were awarded the

Shift Coach position, and the only explanation for this disparity is that Defendant racially

discriminated against him. (Doc. 35 at 5-6.)

His retaliation claim arises out of his allegation that he was demoted from a set-up shift

leader/supervisor position which paid $34.50 per hour to a machine operator, which paid $23.00

per hour. (Doc. 23 at 6.) He argues Defendant, and Billy Beasley and Chuck McCaskill

specifically, demoted him because he complained about the discriminatory hiring practices

within Project Diamond. (Docs. 23 at 6, 35 at 9, 35-3 at 18.)

Plaintiff Jackson alleges he was discriminated against when Defendant initially denied him the Master Tech position, and that the discriminatory practices at Project Diamond continue to this day. (Doc. 36-4 at 13.) He argues that Defendant's failure to properly train him for the Master Tech position (a position which he claims he holds solely in title, but in substance he is simply a Tech) is a daily perpetuation of the racist practices that occur in the workplace. *Id.* In support of his contention, he argues that every other Master Tech in Project Diamond has received adequate formal training for the Master Tech position, and that he is the only one who has been habitually denied the opportunity to train for the position. *Id.*

Plaintiff Jackson's allegation of retaliation arises out of an incident in 2012 in which he alleges Jamey Myles caused his probation officer to be contacted to inform her that Plaintiff was leaving the state to attend a Defendant-sanctioned training in Arkansas, in violation of his probation.[4] (Doc. 36-4 at 15-18.) He alleges that Myles, with help from Keith Wahoske or another higher up official, obtained access to his confidential Employee Assistance Program ("EAP") file which contained information relating to the conditions of his probation. *Id.* One such condition required Plaintiff to seek approval from his probation officer, Jennifer Miller Bush, before leaving town to travel. *Id.* at 15-16. He argues Myles, believing Plaintiff Jackson would be in violation of his probation if he left town without notifying his probation officer, maliciously contacted Jason Hooge, a probation officer and personal friend of Myles's, in hopes that Hooge would notify Bush about Plaintiff Jackson's alleged probation violation. *Id.* Although Myles represents he contacted Hooge out of concern for Plaintiff Jackson and because he "didn't want to see anyone get in trouble" (Doc. 35-6 at 13), Plaintiff Jackson flatly denies this and

---

[4] As noted above, Plaintiff Jackson has four convictions for driving while intoxicated ("DWI"). (Doc. 36-4 at 21.) The fourth DWI resulted in a felony conviction for which he received a suspended sentence of ten years and was placed on supervised probation for five years. (*Id.* at 15, 21.)

argues Myles contacted Hooge with the sole aim of trying to catch him in violation of his probation. (Doc. 36-4 at 15-18.) He further argues the alleged training in Arkansas, which eight employees attended, was merely a pretextual sham so that *Defendant* could get him in trouble with his probation officer. *Id.* at 19.

Plaintiff Jackson's probation was not revoked, and he suffered no adverse employment or legal action as a consequence of this phone call. *Id.* at 20. Moreover, Defendant launched an investigation into the matter, which culminated in the termination of Jamey Myles. *Id.* Plaintiff Jackson also alleges that Glen Graves in Defendant's Atlanta office contacted Ms. Bush in June 2012, which he argues was in further perpetuation of the conspiracy to get him fired or send him to prison.[5]

### F.  Plaintiffs' EEOC Charges

Plaintiff Haynes initially filed a formal charge with the Equal Employment Opportunity Commission ("EEOC") in February 2012 alleging racial discrimination.[6]  (Docs. 23 at 4; 28-1 at 9.) He amended his EEOC charge on June 19, 2012, at which time he contemporaneously filed a charge with the Louisiana Commission on Human Rights ("LCHR"), both of which alleged claims of racial discrimination and retaliation. (Doc. 23 at 8; Doc. 1-1 at 3). Plaintiff Haynes raised the following issues in his perfected EEOC charge: (1) that on November 18, 2011, he was denied a promotion to the Shift Coach job despite his seniority and qualifications, and instead three less qualified white employees received the Shift Coach job; and (2) that on April 9, 2012, he was demoted to a job that pays $11.00 per hour less than the job he was previously working in

---

[5] Defendant does not deny that Glen Graves contacted Ms. Bush, but it maintains that he called her to investigate Myles's actions, and not in an attempt to catch Plaintiff Jackson in violation of his probation. It also notes Myles was terminated as a result of its investigation. (Doc. 29-1 at 12.)

[6] Plaintiff Haynes inadvertently checked the "discrimination based on… age" box, however he did not intend to allege a claim of discrimination based on age. (Doc. 23 at 8.)

retaliation for filing his EEOC charge. (Docs. 1-1 at 1; 28-1 at 9.) The EEOC investigated

Plaintiff Haynes's allegations and dismissed his charge, finding a dearth of evidence to support

his allegations. (Docs. 1-1 at 2; 28-1 at 10; 35-3 at 41.) The EEOC issued him a right-to-sue

letter on August 28, 2014. (Docs. 1-1 at 2; 23 at 8.)

Plaintiff Jackson initially filed a formal charge with the Equal Employment Opportunity

Commission ("EEOC") in February 2012 alleging racial discrimination. (Doc. 29-1 at 9; 14-750,

Docs. 1 at 4.) He perfected his EEOC charge on April 25, 2012, at which time he

contemporaneously filed a charge with the Louisiana Commission on Human Rights ("LCHR"),

both of which alleged claims of racial discrimination. (Doc. 23 at 8; 14-750, Doc. 1-2 at 1.)

Although he claims to have alleged both racial discrimination and retaliation in his EEOC charge

(14-750, Doc. 1 at 8), Plaintiff Jackson only raised the issue of racial discrimination in his

perfected EEOC charge, specifically that:

> [in] June or July 2011, [he] applied for positions as a Shift Coach, Master
> Technician, and Technician. In January 2012, [he] was offered the position as a
> Technician. Other White employees with less seniority and experience were hired
> in the higher paying jobs. Some employees were hired before all the interviews
> were completed.

(Doc. 29-1 at 9; 14-750, Doc. 1-2.)The EEOC investigated Plaintiff Jackson's allegations and

dismissed his charge, finding insufficient evidence to support his allegations. (14-750, Doc. 1-3

at 1.) The EEOC issued him a right-to-sue letter on September 8, 2014. (14- 750, Docs. 1 at 8; 1-

3.)

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its

15

opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). The party opposing the motion for summary judgment may not sit on his hands, complacently relying on the pleadings. *Weyant v. Acceptance Ins. Co.*, 917 F.2d 209 (5th Cir. 1990). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. General allegations that fail to reveal detailed and precise facts will not prevent the award of summary judgment. *Walton v. Alexander*, 20 F.3d 1350, 1352 (5th Cir. 1994). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

### III.   Discussion

#### A.  Parties' Arguments

Defendant argues that Plaintiffs' claims fail for three main reasons. First, with regard to both Plaintiffs Haynes and Jackson, Defendant contends it is entitled to summary judgment on Plaintiffs' state law claims, and argues all state law claims filed by both Plaintiffs were untimely filed. (Docs. 28 at 1-2; 28-2 at 9-10; 29 at 1-2; 29-2 at 9-10.) Second, it argues it is entitled to

16

summary judgment on Plaintiffs' federal racial discrimination claims because neither Haynes nor Jackson can carry their ultimate burden of proving that Defendant's nondiscriminatory reasons for offering each of them Tech jobs, and not their desired positions, were merely pretext for intentional discrimination. (Docs. 28 at 2; 28-2 at 10-17; 29 at 2; 29-2 at 10-17.)

Third, Defendant argues it is entitled to summary judgment as to both Plaintiffs' retaliation claims. With regard to Haynes, Defendant alleges he cannot carry his ultimate burden of proving intentional retaliation, as even he admits in his deposition, he was moved from the Shift Coach job to the A operator job for reasons wholly unrelated to his EEOC charge. (Docs. 28 at 3; 28-2 at 17-20.) It further alleges that the employees to whom Plaintiff Haynes imputes retaliatory conduct were unaware that he filed a charge with the EEOC, and therefore their actions could not have been retaliatory in nature. (Doc. 28-2 at 19.) With regard to Jackson, Defendant alleges he cannot establish a *prima facie* case because, by his own admission, Jackson suffered no adverse employment action as a result of the alleged retaliatory acts. (Docs. 29 at 2; 29-2 at 17-20.)

Plaintiff Haynes' opposition to Defendant's motion for summary judgment does not address the timeliness of his state law claims. (*See* Doc. 35.) Plaintiff Jackson, on the other hand, asserts that he has demonstrated a "'…series of related acts, one or more of which falls within [the] limitations period[,]' [a]nd [he] also '…show[s] an organized scheme leading to and including a present violation, such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action.'"[7] (Doc. 36 at 2 (quoting *Williams v. Otis Elevator Co.*, 557 Fed. App'x 299, 302-03 (5th Cir. 2014).)

---

[7] However, despite this sweeping and conclusory allegation that Plaintiff Jackson stated a claim of discrimination that occurred within the prescriptive period, he cites no specific instances of discrimination or demonstrated which incidents were timely filed. (*See* Doc. 26 at 2.)

Turning to Defendant's allegation that Plaintiffs cannot succeed on their Title VII racial discrimination claims, Plaintiff Haynes argues that he has "'...initially establish[ed] a *prima facie* case by proving facts sufficient to raise an inference of discrimination or retaliation[,]'" and cites Defendant's decision not to initially offer him the Shift Coach job as evidence of its discriminatory practices. (Doc. 35 at 2, 5-8.) Plaintiff Jackson argues "[t]he fact that [Defendant] subjected so many black employees to illegal discrimination, harassment and retaliation, indirectly shows discrimination[,]" and argues he has presented substantial evidence establishing Defendant's reasons for its actions were merely pretext for its discriminatory animus. (Doc. 36 at 3.)

Addressing Defendant's contentions regarding Plaintiffs' claims of retaliation, Plaintiff Haynes insists there exists a genuine issue of material fact as to whether he was asked to perform his A Operator job for a few months after he filed charges with the EEOC as retaliation for the filing. (Doc. 35 at 9.) Jackson insists Defendant acted in retaliation when Jamey Myles contacted his probation officer, and that as a consequence, he suffered an adverse employment action, humiliation, and mental anguish. (Doc. 36 at 4-5.)

Defendant replies that Plaintiff Haynes has failed to offer any evidence to sustain his ultimate burden of proving racial discrimination and unlawful retaliation. (*See generally* Doc. 37.) It argues Plaintiff Jackson attempts to beat summary judgment based on alleged events that are not at issue in this case, including references to a "hostile work environment" and incidents involving a noose, racial graffiti, and a rebel flag. (Doc. 38 at 1.) It alleges he has failed to establish a claim based on racial discrimination, and "[a]t best, he has shown only that his qualifications may have been underestimated." *Id.* at 2. With regard to his retaliation claim, Defendant reasserts its position that Jackson has failed to allege an adverse employment action

that resulted from Myles contacting his probation officer, and thus this claim fails as a matter of law. (Doc. 38 at 4-5.)

Plaintiffs each filed a surreply, largely reasserting the same claims they raised in their oppositions. (*See* Docs. 43-44.) Plaintiff Haynes insists that he not only had more experience than the employees that initially were offered the Shift Coach jobs, but that the chosen (white) employees who were offered the position had little to no supervisory experience and no formal education relevant to the position. (Doc. 44 at 2.) Thus, he argues "[t]his indicates that the only deciding factor in the selection process was race." *Id.* Moreover, he insists Defendants' employees were aware he filed charges with the EEOC, and they acted in retaliation in response to his charges. *Id.* at 4. Plaintiff Jackson's surreply represents that he has observed Keith Wahoske's discriminatory proclivities in town hall and state of the business meetings. (Doc. 43 at 1.) He further alleges Defendant "went to great lengths to mislead the Court that it was being fair during the selection process when in fact it was trying to cover up its discrimination by offering jobs to blacks that they did not want or were not qualified for." *Id.* at 1-2. He maintains he had better qualifications and more experience and seniority than the white employees who were offered the Master Tech position, and this, in and of itself, establishes racial discrimination. Additionally, he realleges "[t]he Arkansas trip was purely a sham to get [him] arrested." *Id.* at 4.

### B.  Plaintiffs' State Law Claims

Plaintiffs allege claims of racial discrimination under the LEDL, La. R.S. 23:301 *et seq.* and under the LWS, La. R.S. 23:964 *et seq.* (Doc. 23 at 8; 14-750, Doc. 1 at 7.) Without reaching the merits of Plaintiffs' claims, it is clear on their face that they have prescribed. Turning first to Plaintiffs' claims under LEDL, R.S. 23:303 provides, in relevant part:

> D. Any cause of action provided in this Chapter shall be subject to a prescriptive period of one year. However, this one-year period shall be suspended during the

pendency of any administrative review or investigation of the claim conducted by
the federal Equal Employment Opportunity Commission or the Louisiana
Commission on Human rights. No suspension authorized pursuant to this
Subsection of this one-year prescriptive period shall last longer than six months.

See *Williams v. Otis Elevator Co.*, 557 Fed. App'x 299, 302 (5th Cir. 2014). Thus, the maximum

prescriptive period for a claim under the LEDL is eighteen months from the time the

discriminatory act occurred.

In this case, Plaintiff Haynes alleges that Defendant engaged in discrimination against

him when it passed him over for the Shift Coach job on November 18, 2011. (Doc. 1-1 at 1.) He

filed a charge with the EEOC in February 2012, and amended it on June 19, 2012. *Id.* Thus, he

had one year from November 18, 2011 to file suit, plus an additional six months while the

prescriptive period was suspended pending resolution of his EEOC charge. *See* La. R.S. 23:303;

*Williams*, 557 Fed. App'x at 302. Accordingly, Plaintiff Haynes had, at a maximum, until May

18, 2013 to initiate his lawsuit against Defendant for its failure to award him the Shift Coach job.

He did not file his complaint until November 26, 2014, and he offers no explanation for his

untimely filing. (*See* Docs. 1; 23; 35.) Therefore, his state law claim arising out of this incident

has prescribed.

Plaintiff Jackson alleges that Defendant engaged in discrimination when it failed to offer

him a Master Tech position in January 2012. (14-750, Doc. 1-2 at 1.) He filed a charge with the

EEOC in April 2012. *Id.* Thus, he had one year from January 2012 to file suit, plus an additional

six months while the prescriptive period was suspended pending resolution of his EEOC charge.

*See* La. R.S. 23:303; *Williams*, 557 Fed. App'x at 302. Accordingly, Plaintiff Jackson had, at a

maximum, until July 2013 to initiate his lawsuit against Defendant for its failure to award him

the Master Tech job. He did not file his complaint until December 2, 2014, and while he makes

general allegations that the discrimination continued within the prescriptive period, he does not

state with any specificity what acts occurred within the relevant time frame.[8] (14-750, Doc. 1.)
Accordingly, his state law claim has prescribed.

Next, Plaintiffs attempt to bring a claim under the LWS, La. R.S. 23:964, *et seq*.
Although the LWS does not have a statute-specific prescriptive period, Louisiana courts
typically apply the general one-year statute of limitations to such claims. *Williams*, 557 Fed.
App'x at 302 (quoting *Nolan v. Jefferson Parish Hosp. Serv. Dist. No. 2,* 01–175, p. 12 (La. App.
5 Cir. 6/27/01); 790 So.2d 725, 733 ("Absent any specification within [§ 23:967], [the] cause of
action ... is subject to the general one-year prescriptive period for delictual actions."); *Langley v.
Pinkerton's Inc.,* 220 F. Supp. 2d 575, 581 (M.D. La. 2002)). Unlike the LEDL, there is no six-
month suspensive provision pending an administrative investigation under the LWS. See La.
R.S. 23:967; *Williams*, 557 Fed. App'x at 302.

In this case, Plaintiff Haynes amended his EEOC charge on June 19, 2012, alleging that
on April 9, 2012, Defendant unlawfully retaliated against him by demoting him to a position that
pays $11 less than the position he was previously working as a consequence of his EEOC charge.
(Doc. 1-1 at 1.) Because there is no suspensive provision under the LWS, Plaintiff Haynes had
until April 9, 2013 to bring his retaliation claim under the LWS. However, as discussed above,

---

[8] Although unartfully articulated, the Court believes Plaintiff Jackson attempted to raise an argument that his injury
was continuous, and thus the continuing tort doctrine would save his claims from prescription. However, this
argument is without merit. "Under Louisiana law, '[w]hen tortious conduct and resulting damages are of a
continuing nature, prescription does not begin until the conduct causing the damages is abated.' For the continuous
tort doctrine to apply, 'the operating cause of the injury [must] be a continuous one which results in continuous
damages.' It does not apply if 'the complained of actions by the defendant were simply the continued ill effects that
arose from a single tortious act.'" *Williams v. Otis Elevator Co.*, 557 Fed. App'x 299, 301-02 (5th Cir. 2014)
(quoting *First Nat'l Bank v. Smith,* 29–350, p. 4 (La.App. 2 Cir. 4/2/97); 691 So.2d 355, 358;
*Crump v. Sabine River Auth.,* 98–2326, p. 7 (La.6/29/99); 737 So.2d 720, 726; *Cooper v. La. Dep't of Pub. Works,*
03–1074, p. 6 (La.App. 3 Cir. 3/3/04); 870 So.2d 315, 323 (citing *Crump,* 737 So.2d at 728–29)). In this case, the
complained of discriminatory conduct was Defendant's initial failure to award Plaintiff Jackson the Master Tech
job, and awarding it to other, less qualified, white employees. While the resulting injury may have lasted until
Plaintiff Jackson was eventually awarded the Master Tech job, the actual injury occurred in January 2012, and thus
his state law claim concerning same has clearly prescribed.

he did not file the instant suit until November 26, 2014, and thus it is clear his retaliation claim under the LWS is time-barred.

Plaintiff Jackson's allegation of retaliation arises from an incident in which co-worker Jamey Myles notified Plaintiff's probation officer that he was leaving the state, which occurred sometime around May or June 2012.[9] Because there is no suspensive provision under the LWS, Plaintiff Jackson had until approximately May or June 2013 to file a retaliation claim under the LWS. However, as discussed above, he did not file suit until December 2, 2014 (14-750, Doc. 1), and therefore, his retaliation claim under the LWS has prescribed.

Based on the foregoing, it is clear that all of Plaintiffs' state law claims were untimely filed. Accordingly, Defendant is entitled to summary judgment on these claims.

### C. Plaintiffs' Title VII Claims

Title VII provides that "[i]t shall be an unlawful employment practice for an employer– (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *accord Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ––– U.S. –––, 133 S.Ct. 2517, 2525, 186 L.Ed.2d 503 (2013); *Vance v. Ball State Univ.*, ––– U.S. –––, 133 S.Ct. 2434, 2440, 186 L.Ed.2d 565 (2013); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92–93, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). For Title VII and § 1981 discrimination claims, the Fifth Circuit held that adverse employment actions consist of "ultimate employment decisions" such as hiring, firing,

---

[9] Plaintiff Jackson's probation officer stated in her deposition that she received two calls from Glen Graves on June 25 and 28, 2012. (Doc. 35-6 at 3.) Defendant represents the purpose of these calls related to the investigation of Jamey Myles, who was ultimately terminated for his actions in this incident. (Doc. 38 at 5.) It staunchly denies that the calls by Graves were to investigate the conditions of Plaintiff Jackson's parole. *Id.* Jamey Myles stated in his deposition that he placed a call to his friend Jason Hooge around the time Plaintiff Jackson was sent to Arkansas for training, but was unable to recall the exact date, but suggests it was around the time of Plaintiff Jackson's trip to Arkansas, which occurred April 30, 2012. (Doc. 35-6 at 12.)

demoting, promoting, granting leave, and compensating. *See McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007); *Alvarado v. Tex. Rangers*, 492 F.3d 605, 612 (5th Cir. 2007); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004). Additionally, the Fifth Circuit has held that a transfer or reassignment can be the equivalent of a demotion, and thus constitute an adverse employment action. *See Alvarado*, 492 F.3d at 612–15; *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 770 (5th Cir. 2001) ("A job transfer that includes a shift change that involves changes in duties or compensation or can be objectively characterized as a demotion may be an 'adverse employment action'....").

"The purposes of Title VII are to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 111 (5th Cir. 1988) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)); *see also Nassar*, ––– U.S. ––––, 133 S.Ct. at 2522.

The Fifth Circuit has explained:

> The Title VII inquiry is whether the defendant intentionally discriminated against the plaintiff. [When there is no direct evidence of discrimination, claims are] analyzed using the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973). Under this framework, a plaintiff must first create a presumption of intentional discrimination by establishing a *prima facie* case. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.' " If the employer sustains its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic.

*Alvarado*, 492 F.3d at 611 (citations omitted); *see also Williams v. Clegg's Nursery, LLC*, No. 13-567, 2016 WL 3702978 at *11 (M.D.La. July 7, 2016).

To overcome a motion for summary judgment on a Title VII claim, Plaintiffs must first establish, by a preponderance of the evidence, a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 801-03, 93 S.Ct. 1817. A *prima facie* case is established once the plaintiff has proven: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) she was replaced by someone outside the protected class; or in the case of disparate treatment, others similarly situated were treated more favorably. *Williams*, 2016 WL 3702978 at *11 (quoting *Minnis v. Board of Supervisors of La. State Univ.*, 55 F. Supp. 3d 864, 875 (M.D.La. 2014)). Once the *prima facie* case is established, there exists a presumption of discrimination, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Meinecke v. H & R Block*, 66 F.3d 77, 83 (5th Cir.1995) (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, '*if believed by the trier of fact,*' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993)) (emphasis in original)); *accord Vaughn v. Woodforest Bank,* 665 F.3d 632, 636 (5th Cir. 2011); *Brown v. Bunge Corp.,* 207 F.3d 776, 781 (5th Cir. 2000). If the employer carries its burden, then the plaintiff must come forward with evidence establishing its proffered motive is pretextual for discrimination; however, mere speculation and an employee's personal belief are insufficient to create a fact issue as to pretext. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc) ("It is more than well-settled that an employee's subjective belief that he suffered an adverse

employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason."), *superseded by statute on other grounds as recognized by ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n. 5 (5th Cir. 2012).

### i.   Plaintiffs' disparate treatment claims

Plaintiffs each raise a claim of intentional discrimination based on their race in violation of Title VII. Disparate treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin. *See Pacheco v. Mineta,* 448 F.3d 783, 787 (5th Cir. 2006) (internal citations omitted). Proof and finding of discriminatory motive is required. *Id.* "The burden of establishing a *prima facie* case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094. If a plaintiff establishes a prima facie case, the burden then shifts to the defendant "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* The defendant need not persuade the court that it was actually motivated by its proffered reasons, but it is required to "clearly set forth, through the introduction of admissible evidence, the reasons for plaintiff's rejection" in a "legally sufficient [manner] to justify a judgment for the defendant." *Id.* at 255, 101 S.Ct. at 1095. If the defendant meets this standard,

> [t]he plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by
showing that the employer's proffered explanation is unworthy of credence.

*Id.* at 256, 101 S.Ct. at 1095 (quoting *McDonnell Douglas*, 411 U.S. at 804-05, 93 S.Ct. at 1825-
26.)

### a.  Plaintiff Haynes's racial discrimination claims

Plaintiff Haynes alleges Defendant discriminated against him when it passed him over for the

Shift Coach job in Project Diamond. (Doc. 23 at 4.) He argues he had superior credentials and

seniority than the employees who were selected for the Shift Coach positions, and the only

plausible explanation for Defendant's actions is that it discriminated against him on the basis of

race. (Docs. 23 at 4; 35 at 6; 44 at 2.) He argues jobs were awarded to individuals in the "good

ol' boy network", and managers for Defendant awarded jobs to their white friends. (Doc. 35-1 at

4.) He acknowledges that Greg Johnson and Kenny Myles, both black employees, were offered

the Shift Coach position ahead of him, but maintains they were offered the positions because

Defendant wanted to "set [them] up to fail." (Doc. 35-1 at 19.) He refers to Johnson and Myles

as "tokens" and argues that

> if [Defendant] put[s] a few black people in positions, then you don't have to be
> here for a discrimination lawsuit. We say, well, we've got some here. They're not
> that ignorant that they're going to negate all of the black people. When you've got
> all of these black people applying, you've got to at least look like you're doing it
> right.

*Id.* He further argues that regardless of his qualifications, several of the white employees selected

for the Shift Coach position had worse qualifications than he possessed, including:

> David Morris who has no education background, no specialized training in
> leadership. All he did was special projects. He has no extraordinary people skills.
> You've got Brenda Allen, no education, no educational background, horrible
> people skills, which is indicative of her performance today. You have Terry
> Hotard, horrible people skills, which is indicative of his past history with work
> relationships. He has no educational background, no specialized skills. All of
> those people were selected ahead of me. And then you've got Jon Stalder, he has

26

somewhat comparable skills. He doesn't have the [tenure] that I have, but according to the stipulations set by [Defendant], he wasn't eligible for the project because he had disciplinary actions within the five-year window.
So you have got one employee with somewhat comparable experience that should have been disqualified according to [Defendant's] standard because he had a disciplinary action in his file within the five-year window. So basically, you've got three individuals that shouldn't have even been considered for that project that [were] selected ahead of an individual that was head and shoulders above them…

(Doc. 35-1 at 10-11 (quoting Doc. 35-3 at 12-13).)

Defendant argues that although Plaintiff Haynes met the minimum qualifications for the Shift Coach job, it "did not believe that [he] was relatively equal in qualifications to some of the other applicants." (Doc.28-2 at 6.) It notes the suggestion it was racially discriminatory in its hiring practices contradicts the fact that it offered the Shift Coach position to two black employees. *Id.* at 7. It also notes that Plaintiffs were not the only ones dissatisfied with the job placements in Project Diamond, and that the Union filed numerous grievances on behalf of both black and white employees. *Id.* at 8. It maintains that the employees selected for the Shift Coach job before Plaintiff Haynes were more qualified under the new adaptive work system, and that its reasons for selecting these individuals were in no way based upon a racial bias. Accordingly, it argues that even assuming Plaintiff Haynes can make a *prima facie* case of discrimination, he cannot carry his ultimate burden of establishing Defendant's proffered race-neutral reasons for its hiring decisions were pretext for a discriminatory motive. *Id.* at 11.

Plaintiff attaches to his opposition to Defendant's motion for summary judgment several evaluation sheets for the white employees who received an offer for the Shift Coach job,[10] as well as his own evaluation sheet for the Tech position. (Doc. 35-8 at 33-36, 39.) The Shift Coach

---

[10] The attached evaluation sheet for Brenda Allen reflects she was initially evaluated for a Tech position. (Doc. 35-8 at 33.)

position was evaluated on the following categories:[11] "Entrepreneurship & Thinking";

"Adaptability & Collaboration"; "Initiative"; and "Knowledge & Skills". (Doc. 35-8 at 34-36.)

Terry Hotard's evaluation reflects he received "High" marks in all the aforementioned

categories. *Id.* at 34. His evaluators expressed no concerns with his capabilities in the Shift

Coach position, and with regard to his qualifications and experience, they noted: "Led TORCH

process in T/T Converting, willing to push status quo, open to change, Safety Instructor, Audit

Team Member, Represents facility in sister facilities, NEO instructor, WATCH lead in Towel

Converting, good challenger, High integrity, very strong communicator" and noted "MBM

selection process, supervisory review and Diamond Selection Team feel like Terry will be a very

strong candidate for Shift Coach position." *Id.*

David Morris also consistently received "High" marks in all categories. *Id.* at 35. With regard

to his qualifications and experience, the evaluators wrote:

> Has taken the lead on multiple projects w/in the dept. (dust collection and
> Combustible Dust Team), leads Training effort for the last 18 months for the T/T
> Department, leads Convergance [sic] in T/T Area, comfortable communicating w/
> peers and management, enters department PSQ documents, very knowledgeable
> on and understand day to day business needs, good computer skills, Leads annual
> SOP review for Converting.

*Id.* The expressed no concerns for his performance, and proposed "MBM selection process,

supervisory review and Diamond Selection Team feel like David will be a very strong candidate

for Shift Coach position." *Id.*

Jon Stadler likewise received "High" marks across the board. *Id.* at 36. With regard to his

qualifications and experience, the evaluators remarked, "Business Management Degree, High

---

[11] As noted above, Brenda Allen's and Plaintiff Haynes' attached evaluation was for the Tech position. (Doc. 35-8 at 33, 39.) While they were presumably evaluated on the same criteria as the employees considered for the Shift Coach position, the portions of the document which state the criteria are blacked out. *Id.* Thus, for purposes of this motion, the Court assumes the evaluations were based on the same factors.

Level of interpersonal skills, Very strong communication skills, High Level computer skills, Willingness and ability to be creative when dealing w/ issues, Very well respected and thought of by co-workers, not afraid to challenge (LOTO Example), Respects others['] opinions." *Id.* They expressed no concerns with his performance, and noted "Feel like Jon will be successful in any role." *Id.* The evaluators noted in the Proposal section: "MBM selection process, supervisory review, and Diamond Selection Team feel like Jon will be a very strong candidate for Shift Coach position." *Id.*

Although Plaintiff Haynes does not include similar evaluation sheets for Greg Johnson and Kenny Myles, he nonetheless admits they are black employees who were offered one of the four Shift Coach positions. (Doc. 35-1 at 19 (quoting Doc. 35-3 at 37).) Johnson was first offered a Shift Coach position, along with Hotard, Morris, and Stadler, and when he refused the offer, Defendant offered the position to Myles. (Doc. 28-1 at 8.) It was only after Myles also declined the job that Defendant offered the position to white employee Brenda Allen. *Id.* at 9. Allen's attached evaluation (which was for the Tech position) reflects that she received two "High" marks in the area of "Entrepreneurship & Thinking" and "Medium" marks in the remainder of the categories. Under her qualifications and experience, the evaluators noted she is "self motivated, respected by co-workers and management, high humility and integrity, willing to challenge the status quo, high attention to detail, great team player, previous converting experience prior to GP, leads by example." (Doc. 35-8 at 33.) Under areas of improvement, the evaluators noted "Continue to develop technical and troubleshooting abilities, learn to give and receive effective feedback, develop and foster MBM culture in work activities[.]" Under the Proposal section, the evaluators stated: "MBM selection process, supervisory review and

Diamond Selection Team feel like Brenda will be a very strong candidate for the Dry End Technician position as a result of his [sic] work history and performance." *Id.*

Plaintiff Haynes also includes his own evaluation sheet, which was for the Tech position. (Doc. 35-8 at 39.) He received High scores in the Entrepreneurship & Thinking and Adaptability & Collaboration categories. *Id.* He received a Medium score under the Initiative category, and a Low score in the Knowledge & Skills category. *Id.* Under qualifications and experience, the evaluators commented that he "Understands business process adequately, [has] good computer skills, [and is] able to communicate w/ co-workers[.]" *Id.* Under areas of improvement, the evaluators stated he: "needs to prioritize work better, lead by example rather than by words, develop technical skill level further, constantly in need of coaching even after his experience and length of time in the department[.]" *Id.* Under its proposal section, the evaluators stated, "MBM selection process, supervisory review and Diamond Selection Team feel like Jeff will be a good candidate for the Dry End Technician position as a result of the MBM interview and supervisory review." *Id.*

Although Plaintiff Haynes argues that he "had not only more experience and education than the individuals selected ahead of him", he offers only conclusory statements of his personal beliefs and he has not established an objective basis for his contention that race was a motivating factor in Defendant's selections for the Shift Coach position. The foregoing clearly demonstrates that Defendant made offers for the Shift Coach job to those individuals whom it believed would be most successful in the position. Moreover, it demonstrates the nondiscriminatory criteria upon which the decisions were based, and Plaintiff Haynes has failed to establish that these delineated standards were pretext for Defendant's discriminatory animus. Accordingly, Defendant is entitled to summary judgment on this claim.

30

### b.  Plaintiff Jackson's racial discrimination claims

Plaintiff Jackson argues Defendant discriminated against him when it passed him over for one of the top positions in Project Diamond in favor of less qualified and less experienced white employees. (Doc. 36 at 8.) He admits that although he put Shift Coach job as his first choice, he only did so because of its higher pay rate, and that he really preferred (and his skills were more suited for) the Master Tech position. (Doc. 36-4 at 27.)

Defendant argues that one of the reasons Plaintiff Jackson was not selected for a Shift Coach or Master Tech position in Project Diamond was because of his own admitted aversion to leadership roles. (Doc. 29-2 at 13 (citing Doc. 36-4 at 27).) As Defendant explains:

> Jackson admitted the only reason he listed Shift Coach as his primary choice was because of the money. He only intended to work another three to five years and then planned "to be riding of in the sunset anyway… with a chunk of the cheese." [Doc. 36-4 at 27.] As mentioned, [Defendant] was looking to fill the Shift Coach and Master Tech jobs with persons who were interested in supervising and training others and working hard to make Project Diamond a success. They were not looking to fill those jobs with persons who only desired to make the most money to enable them to coast into retirement.

(Doc. 29-2 at 13.) Additionally, it cites Plaintiff Jackson's evaluation summary, which stated that he needed to "learn to challenge in a respectful manner," and notes that Jackson admitted in his deposition that he made a snarky remark that his interviewers likely did not appreciate. *Id.* (citing Docs. 28-3 at 28; 36-5 at 14.) Moreover, it cites Jackson's deposition testimony in which he states he did not want to be in a supervisory capacity because he does not "deal with B.S. very well[,]" and argues this conflicts with the role of the Shift Coach and Master Tech, both of which require an individual who is "able to deal objectively and well with employee problems and conflicts." *Id.* (citing Doc. 36-4 at 27.)

Furthermore, Defendant argues Plaintiff Jackson's claim of racial discrimination is defeated by the fact other similarly situated white employees, including Twana "Jo" Whittington and

Wayne Grunewald, who worked the same position in the same department as Plaintiff Jackson, and who had the same start date and thus had equal seniority, both listed Master Tech as their top job choice, and both were offered only Tech jobs. (Doc. 29-2 at 15.) It also notes a third white employee, Randall Arnone started just a few months after Plaintiff Jackson, Whittington, and Grunewald, and who also listed Master Tech as his first choice, was only offered a Tech position in Project Diamond. Finally, it points to the fact that "five of the original twelve try end Master Techs were minorities, three blacks and two Hispanics[,]" and "two of the original eight wet end Master Techs are black[.]" *Id.* at 17. Based on the foregoing, Defendant concludes Plaintiff Jackson cannot establish racial discrimination was the motivating factor behind his failure to secure a top position in Project Diamond.

Unlike Plaintiff Haynes, Plaintiff Jackson does not provide the evaluation sheets for the employees who he alleges received offers to work as Master Techs despite their inferior qualifications. However, Defendant attaches as an exhibit to its motion for summary judgment Plaintiff Jackson's evaluation sheet, which reflects he received "High" marks across the board, except in the category of Knowledge and Skills, in which he received a "Medium" score.[12] (Doc. 28-3 at 28.) Under his qualifications and experience, his evaluators stated: "was electrical engineering major @ Southern University, shown ability to lead in the past, able to communicate w/ co-workers and management, shown the ability to learn new technology in the past." *Id.* Under areas of improvement, they noted, "needs to work on his integrity and humility, become a leader by example, foster and develop MBM culture in his actions, learn to challenge in a respectful manner[.]" Under the proposal section, the evaluation team stated: "MBM selection

---

[12] Plaintiff Jackson's evaluation sheet reflects he was being evaluated for the Dry End Technician position. (Doc. 28-3 at 28.) As was the case in Plaintiff's Haynes evaluation sheet, the row listing the specific categories is blacked out, and therefore this Court is left to assume the categories for the Tech evaluations mirror those for the Shift Coach evaluations.

process, supervisory review and Diamond Selection Team feel like Gerald will be a very strong candidate for the Dry End Technician position as a result of his work history and performance." *Id.*

Defendant has clearly met its burden by proffering ample race-neutral reasons for its decision not to initially offer Plaintiff Jackson a top position within Project Diamond. Plaintiff Jackson has not come forward with any evidence outside of his own conclusory allegations and personal beliefs to demonstrate that Defendant's proffered reasons were pretext for racial discrimination. Therefore, it is clear Plaintiff Jackson cannot succeed on this claim.

In addition to his claim that arises out of Defendant's failure to award him a Master Tech or Shift Coach position, Plaintiff Jackson also raises several broad and conclusory allegations that Defendant "subjected so many black employees to illegal discrimination, harassment and retaliation, [which] indirectly shows discrimination[,]" and argues he has "come forward with substantial evidence that the defendant's proffered reason was a mere pretext for discrimination or retaliation." (Doc. 36 at 3.) However, the problem with these allegations, is not only that they are overly broad and fail to specify any precise instances of discrimination, but he cites to no specific part of the record; rather, he merely cites to all seventy-two exhibits (375 pages) to substantiate his claims. (*See, e.g.*, Doc. 36 at 3, n. 20, 23, p. 4, n. 30.) As the Seventh Circuit has so eloquently explained, "Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). This Court declines to scrutinize every page of the record in minute detail in hopes of unearthing some discrete occurrences of discrimination.

In any event, Plaintiff Jackson *does* provide the Court with one specific allegation of discriminatory practices when he alleges that Defendant refuses to properly train him for the Master Tech position. (Docs. 36-1 at 15, 19; 36-4 at 13.) He represents that he is the only Master

33

Tech who has not received formal training for his position, and this fact supports his allegations of discrimination within the workplace. *Id.* He argues this qualifies as an adverse employment action that renders Defendant in violation of Title VII. Defendant has not responded to this allegation in its reply brief. (*See generally* Doc. 38.)

While this allegation, if true, is indeed troubling, unfortunately for Plaintiff Jackson, the Fifth Circuit "has consistently declined to find that a denial of training can constitute an adverse employment action." *Brooks v. Firestone Polymers, LLC*, 70 F.Supp.3d 816, 839 (E.D.Tex. 2014) (citing *Hollimon v. Potter*, 365 Fed. App'x. 546, 549 (5th Cir.2010) ("[A] refusal to train is not an adverse employment action under Title VII.") (citing *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 406 (5th Cir. 1999)); *Roberson v. Game Stop/Babbage's*, 152 Fed. App'x. 356, 361 (5th Cir. 2005), *cert. denied,* 548 U.S. 924, 126 S.Ct. 2982, 165 L.Ed.2d 986 (2006) (finding no adverse employment action where plaintiff was denied training on a computer system); *Shackelford,* 190 F.3d at 406 (finding no adverse employment action where plaintiff was denied access to training on specialized filing software); *Dollis v. Rubin*, 77 F.3d 777, 779 (5th Cir. 1995). In *Hollimon*, the black plaintiff alleged he was subject to discrimination because his white co-workers received training that he was denied. 365 Fed. App'x at 549. The court unambiguously found the plaintiff was not entitled to relief on these grounds because "a refusal to train is not an adverse employment action under Title VII." *Id.*

In light of clear Fifth Circuit precedent, and Plaintiff Jackson's failure to provide any statutory or jurisprudential support for his allegation that Defendant's failure to train him constitutes an adverse employment action, the Court finds Plaintiff Jackson's failure to train claim does not implicate any adverse employment action. Therefore, Plaintiff Jackson cannot establish a *prima facie* case of employment discrimination because he fails on the third prong, as

he cannot demonstrate an adverse employment action. Accordingly, Defendant is entitled to summary judgment on Plaintiff Jackson's discrimination claims.

### ii. Plaintiffs' retaliation claims

Plaintiffs also assert a claim for retaliation in violation of Title VII. "Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids[.]" *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 59, 126 S.Ct. 2405, 2410, 165 L.Ed.2d 345 (2006). (quoting § 2000e–3(a)). "An employee has engaged in activity protected under Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Grimes v. Tex. Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996).

 A plaintiff establishes a prima facie claim of retaliation by showing: "(1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 557. Ultimately, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* — U.S. —, 133 S.Ct. 2517, 2521, 186 L.Ed.2d 503 (2013). For an employment actions to be considered adverse in the context of a retaliation claim, they "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 57, 126 S.Ct. at 2409. The antiretaliation provision is not limited to harm incurred in the workplace; an employer "can effectively retaliate against an employee by taking actions not directly related to his employment

or by causing him harm *outside* the workplace. *White*, 548 U.S. at 63; 133 S.Ct. at 2412 (emphasis original) (citation omitted).

### A.  Plaintiff Haynes's retaliation claim

As noted above, Plaintiff Haynes's retaliation claim arises out of his allegation that he was demoted from a set-up shift leader/supervisor position which paid $34.50 per hour to a machine operator, which paid $23.00 per hour as a consequence of his complaints of the illegal discrimination taking place in Defendant's workplace.[13] (Doc. 23 at 6.) He argues that Defendant's notion that Billy Beasley was unaware he filed an EEOC charge "defies commonsense and the practices and procedures of the GP workplace."[14] (Doc. 35 at 9.) He further argues the fact he returned to the Shift Coach job after three months of working as an A Operator was Defendant's disingenuous attempt to escape liability from a retaliation suit. *Id.* at 10.

Defendant argues it is entitled to summary judgment on this claim because Plaintiff Haynes "cannot establish his ultimate burden of proving intentional retaliation" and contends the sole reason he was temporarily transferred back to his operator position was "due to the significant number of vacancies existing in the Tissue Converting Department when employees transferred to Project Diamond and the hectic state in the department due to the shutdown of the old tissue machine." (Doc. 28 at 2-3.) Specifically, it alleges that the employees selected for positions in Project Diamond transitioned to their new positions in waves beginning in February 2012. (Doc. 28-1 at 11; 28-2 at 18.) On April 9, 2012, a wave of employees, including Twana "Jo"

---

[13] Plaintiff Haynes sufficiently alleged a claim of retaliation in his amended EEOC charge. (Doc. 1-1.)

[14] However, Plaintiff Haynes does not sufficiently support this allegation, as he cites to all 72 of his exhibits (382 pages) in support of his contention. (*See* Doc. 35 at 9, n. 98.) As discussed above, "[j]udges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). The Court will not scour through hundreds of pages of exhibits in hopes of uncovering information that suggests Defendant's argument "defies commonsense."

Whittington, an A Operator in the Tissue Converting Department, transferred to Project
Diamond. *Id.* Whittington's transfer left the Tissue Converting Department in need of an A
Operator; Haynes had previously worked as an A Operator, and was therefore qualified to
temporarily fill the position. *Id.* It further represents that although Whittington did not last in
Project Diamond and ultimately returned to her A Operator job in the Tissue Converting
Department, the department nonetheless remained short staffed. (Doc. 28-1 at 12; 28-2 at 19.) It
maintains Haynes was not the only one called upon to perform a different job during this time, as
"many employees in the department were asked to perform different or additional duties." (Doc.
28-2 at 19.) Additionally, Defendant points to Beasley's sworn declaration which avers he had
no knowledge Plaintiff Haynes's EEOC charge. (Docs. 28-2 at 19; 28-6 at 2.) According to
Defendant, it follows that Plaintiff Haynes cannot establish a causal connection between the
adverse employment action and the protected conduct, and it is therefore entitled to summary
judgment on this claim. (Doc. 208-2 at 19.)

On this claim, Plaintiff Haynes has established a *prima facie* case of retaliation. He has
clearly demonstrated that: (1) he participated in an activity protected by Title VII when he filed a
charge of racial discrimination with the EEOC and (2) that he suffered an adverse employment
action when he was demoted to the A Operator job and received an $11 per hour reduction in
pay. Additionally, he has alleged sufficient facts to make a *prima facie* showing of a plausible
causal connection between his EEOC charge and his demotion. *See McCoy*, 492 F.3d at 557.
Therefore, the burden shifted to Defendant to rebut his *prima facie* case, which it may do by
producing a legitimate, non-discriminatory reason for placing Plaintiff Haynes in the A Operator
position. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Defendant's burden is one of
production, and Defendant satisfied its burden by alleging that the Tissue Converting

Department was short-staffed and required more A Operators than were currently working in the department, and because Plaintiff Haynes had ample experience working as an A Operator, he was asked to temporarily fill the position. (Docs. 28-1 at 12; 28-2 at 19; 28-6 at 1-3.) It alleges that the return of Whittington to the Tissue Converting Department did not restore the staff to its original numbers, and even after her return, Plaintiff Haynes was still needed as an A Operator to adequately staff the department. *Id.* It notes he resumed work as Shift Coach job three months later, when the department was properly staffed. *Id.* In support of its position, Defendant cites to Beasley's declaration in which he states:

> Although Ms. Whittington subsequently returned to the Tissue Converting Department, we were still short-handed, and thus, we still needed Mr. Haynes to perform his A Operator job. Indeed, as I told Mr. Haynes in an April 2012 email, "We are still going to have to backfill to Diamond for the folks that have come back. We still don't have the number of people to start reducing the number of folks on a 6X3 rotation or to have 4 set-up shift leaders. We still need your help on the rewinder right now."

(Docs. 28-1 at 11-12; 28-6 at 1.) Defendant attached a copy of that email, dated April 24, 2012, to Beasley's declaration. (Doc. 28-6 at 3.) Accordingly, Defendant satisfied its burden, and Plaintiff Haynes must now prove its proffered motive was pretextual for unlawful retaliation. *See Alvarado*, 492 F.3d at 611.

In an attempt to rebut Defendant's contentions, Plaintiff Haynes makes broad, conclusory allegations that their nondiscriminatory reasons pretextual and alleges Beasley and McCaskill simply wanted to punish him. (Doc. 35 at 9-10.) He cites testimony from his own deposition and his affidavit to support his claims. Specifically, he cites the following:

**Q: Are you asserting a retaliation claim in this case?**
A: That's what I was getting to. Retaliation was when we separated, when we went to the Diamond, the individuals selected to the Diamond who accepted the positions that they had, well, they went to the Diamond process. I chose not to go because I had already suffered enough humiliation and embarrassment. There's no way that I would put myself through the emotional trauma of having to go and

38

take an entry level position. Not only would it be a financial hardship, but it would be a detriment to me as a person having to enduure [sic] the ridicule of having to take something like that.

So now, to make a long story short, when I went to the bath area, I stayed where I was. I was a shift supervisor which was an hourly position, which paid I think at that time $34 an hour, $35 an hour. So immediately when I went to the other position, and I stayed where I was because at that time I was set up, and everybody who left went to the Diamond, and I stayed. So immediately when I went to the other position, they demoted me to an operator which was an $11 an hour reduction. I say, why are you demoting me to an operator? I trained everybody that stayed in the job. I trained every individual that stayed in the job. I personally trained them. So you are taking the senior guy with all of the experience, you are giving me an $11 an hour reduction, you are forcing me back on a job which I hadn't done in years so—and then you are demoting me? They said, well, we need you out here, we need you to be working on the job I was like, what are you talking about? What about all of these other individuals who have a couple of months experience, and I've got 12 years, 13 years, and after they demoted me to a lower position, and then they said, well, we need an operator, so when Jo Whittington came back, I said, you got an operator. They said, no, we still need you in the position. Basically, what they were saying is we're going to show you because when I filed those discrimination papers, they humiliated me. They had me going out there when I was a supervisor working in dirt, dust everywhere. They basically tried to humiliate me in front of my peer group. That's what they did.

**Q: When you're talking about the discrimination papers, you're talking about your EEOC charge?**

A: EEOC papers.

**Q: Now, who are you alleging demoted you?**

A: I know that Chuck McCaskill was a part of my false documentation, James Mylkes was a part of my false documentation, and Billy Beasley was a part of that process.

**Q: Now, what are you talking about when you say "false documentation"?**

A: Which means they lied all through my interview sheets. They lied on all of the documentation that pertains to inquiring about being selected to the Diamond process. They fabricated all kind of lies on my papers which they thought I would never see.

**Q: Well, what does that have to do with your alleged demotion once you went back to your other job?**

A: Chuck McCaskill had primary responsibility. Billy Beasley had primary responsibility because they weren't selected to the process, so the demotion had everything to do with Randy Hetland, Chuck McCaskill and Billy Beasley, but they conferred with the people from the old department because even though they are part of another department, they're still in cahoots with each other. They still communicate with each other, so…

**Q: What evidence do you have that Chuck and Billy talked to people over in Diamond?**

A: Because they still conversate with them. The comments was in conjunction with each other. Even with the comments they had, the comments on all of my documentation which I saw later, they coincided with each other.

**Q: Do you know if Jamey told Chuck and Billy to demote you?**

A: No.

**Q: Do you know if anyone told them to demote you?**

A: No, no. I know that Chuck was a part of that process.

…

**Q: …I'm going to hand to you and your attorney a document that I have marked as "Exhibit #33," and this is an e-mail you produced to us in this lawsuit; correct?**

A: Give me a second to read it.

**Q: Sure.**

A: Yes. They were indicating that they were one operator short, and that was the reason why they had put me into that position. To show that there were lying, Jo Whittington came back. They retrieved the one operator they were short, and they still left me in that position. So if you're only one operator short, and you indicated that you need one more operator and you could put me back in my position, when Jo Whittington declined to be a part of the Diamond process, came back to original operation, they still left me in my position because I hadn't finished my little tenure yet. They still wanted to punish me.

**Q: They wanted to punish you for challenging Chuck?**

A: Absolutely.

(Doc. 35-3 at 17-18, 50.)

> GP's discrimination, harassment and retaliation involving Twana "Jo" Whittington is as follows:
> Billy Beasley and Chuck McCaskill first stated that they needed another operator. When Jo Whittington returned to be an operator, they did not move me back to the position in which I was most experienced. Instead they demoted Brandon White to teach me a lesson. They left Seth Jones in the supervisory position being junior to me and didn't allow Jason Broussard to assume the position which he was qualified for. They were deliberately not going to allow me to return to the Shift Leader position under any circumstances. All of these people are white.

(Doc. 35-6 at 21.)

Despite Plaintiff Haynes's vehement insistence that the above supports a finding of pretext sufficient to defeat a motion for summary judgment, a review of the exhibits he cites in support of his position and of the record as a whole reveal that his contentions are merely speculation and statements of his personal beliefs. He has cited no definitive (or even plausible) evidence that

Beasley, McCaskill, or others he alleges were responsible for his demotion had any knowledge of his EEOC filing, and he is therefore unable to establish a causal connection between his protected activity and adverse employment action. His conclusory allegations and personal beliefs are insufficient to establish Defendant's nondiscriminatory reasons were pretextual. *See Douglass*, 79 F.3d at 1430. Accordingly, Defendant is entitled to summary judgment on Plaintiff Haynes's retaliation claim.

### B.  Plaintiff Jackson's retaliation claim

As discussed above, Plaintiff Jackson alleges Defendant retaliated against him when it caused his probation officer to be notified about his trip to Arkansas, which he alleges was in furtherance of a conspiracy to catch him in violation of his probation. Defendant argues Plaintiff Jackson failed to mention any retaliation based claim in his EEOC charge, which solely alleged racial discrimination on the grounds he was passed over for the Master Tech position, and therefore his claim is not properly before the Court, and in any event, he suffered no adverse employment action as a result of this incident. (Doc. 29-1 at 9; 14-750, Doc. 1-2 at 1.)

Raising a claim with the EEOC is a jurisdictional prerequisite to anthe ony Title VII suit. 42 U.S.C. § 2000e-16(c); *Brown v. GSA*, 425 U.S. 820, 833, 96 S. Ct. 1961, 1968, 48 L.Ed. 2d 402, 411 (1976); *Ray v. Freeman*, 626 F.2d 439, 442 (5th Cir. 1980); *Hoffman v. Boeing*, 596 F.2d 683, 685 (5th Cir. 1979). A judicial complaint that does not allege the exhaustion of administrative remedies is subject to dismissal. The scope of a judicial complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970). The Fifth Circuit in *Sanchez* further explained:

> The logic of this rule is inherent in the statutory scheme of Title VII. A charge
> of discrimination is not filed as a preliminary to a lawsuit. On the contrary, the

41

> purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC. Once a charge has been filed, the Commission carries out its investigatory function and attempts to obtain voluntary compliance with the law. Only if the EEOC fails to achieve voluntary compliance will the matter ever become the subject of court action. Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation. Within this statutory scheme, it is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.
>
> A more exacting rule would be destructive of the logic of the statutory scheme, for it would impede the ability of the Commission to effect voluntary compliance. If an alleged discriminator knew that a particular issue which was the subject of EEOC conciliation efforts could never be the subject of a civil action, his incentive toward voluntary compliance would be lessened.

*Sanchez*, 431 F.2d at 466.

However, the scope of the inquiry is not limited to the exact charge brought to the EEOC. *Stewart v. May Dep't Stores*, 294 F. Supp. 2d 841, 848 (M.D. La. 2003). The plaintiff's cause of action may be based, "not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." *Fine v. G.A.F. Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1993).

In this case, while the threat of an employer contacting one's probation officer in retaliation for filing a complaint with the EEOC "could well dissuade a reasonable worker from making or supporting a charge of discrimination," Plaintiff Jackson's failure to allege a retaliation claim in his EEOC charge procedurally defaults this claim, as he did not exhaust his administrative remedies. Unlike Plaintiff Haynes, Plaintiff Jackson did not later amend his EEOC charge to allege a claim of retaliation. Thus, while his charge unquestionably put Defendant on notice of his discrimination claim, a retaliation claim based on the phone call to Bush could not

"reasonably be expected to grow" from his filing. *Sanchez*, 431 F.2d at 466; *Fine*, 995 F.2d at 578. In short, because Plaintiff Jackson omitted from his EEOC charge any allegation that could reasonably be construed as a retaliation claim, his claim is not properly before this Court and Defendant is entitled to summary judgment on his retaliation claim.

## IV.    Conclusion

Accordingly, **IT IS ORDERED** that Georgia Pacific, LLC's Motions for Summary Judgment (Docs. 28-29) are GRANTED; and **IT IS FURTHER ORDERED** that Plaintiffs Jeffrey Haynes's and Gerald Jackson's claims are **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on <u>September 29, 2016</u>.


_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**